1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

# SOUTHERN DISTRICT OF CALIFORNIA

10
11

JESUS E. GONZALEZ, and CALEXICO
POLICE OFFICERS' ASSOCIATION,

12

Plaintiffs,

13

vs.

14

CITY OF CALEXICO; CALEXICO
POLICE DEPARTMENT; MARIO V.

15

SANCHEZ, CHIEF OF POLICE,
individually and in his official capacity;

16

JAMES L. NEUJAHR, LIEUTENANT,
individually and in his official capacity;

17

JOHN RENISON, CITY COUNCIL
MEMBER, individually and in his official

18

capacity; ALEX PERRONE, CITY
COUNCIL MEMBER, individually and in

19

his official capacity; and DOES 1 through
10, inclusive,

20

Defendants.

CASE NO. 03cv2005 WQH (PCL)

**ORDER**

(Docs. # 127, 187)

21

Hayes, Judge:

22

The matter before the Court is Defendants' Motion for Summary Judgment as to

23

Plaintiff Jesus E. Gonzalez's claim for violation of his First Amendment rights to free speech

24

and freedom of association.  (Doc. # 127.)

25

## I.     Background

26

In 2000, discussion began between then-Chief Tommy Tunson of the Calexico Police

27

Department ("CPD") and representatives of the Calexico Police Officers' Association ("POA")

28

concerning the types of firearms available to Calexico police officers.  (Christian Decl. ¶ 8.)

In June of 2001, Chief Tunson authorized the purchase of 15 "AR-15" assault rifles, which were paid for by the individual officers and registered to the CPD. (Sanchez Decl. ¶¶ 4, 10; Barker Decl., Ex. C.)  Later in 2001, the AR-15 rifles were issued to the officers who had ordered them. (Christian Decl. ¶ 10.)

In December 2001, Defendant Mario Sanchez became Chief of the CPD. (Sanchez Decl. ¶ 2.)  In March 2002, the 15 officers who owned the rifles attempted to register them in their own names. (Sanchez. Decl. ¶ 5.) Chief Sanchez submitted a letter with each registration application stating that "I certify that the firearm to be registered will be used in performing official duties." (Sanchez Decl. ¶ 5, Ex. A.)  All of the officers' registration applications were rejected by the California Department of Justice ("California DOJ") in May 2002.  Based upon newly-enacted legislation, the AR-15 rifles were now classified as "short barrel rifles," which could only be possessed by law enforcement agencies, and not individuals. (Sanchez. Decl. ¶¶ 6-8.)  The California DOJ determined that either the rifles would have to be fitted with longer barrels or would have to be possessed by the CPD rather than by the officers.  (*Id.*) After discussion with Chief Sanchez, the POA decided to keep the rifles registered in the name of the CPD and not to purchase the longer barrels. (Christian Decl., Ex. F; Hackett Decl. ¶ 12.)

During the first half of 2003, the POA and Chief Sanchez and other City officials engaged in discussions regarding the desire of the POA to be trained in the use of the AR-15 rifles. (Christian Decl. ¶¶ 13-20, Exs. B-C; Hackett Decl. ¶¶ 15-17; Sanchez Decl., Ex. I.) The training was delayed because Chief Sanchez rejected the POA's preferred trainer (an officer who the POA believed was already qualified to train them), and instead selected two other untrained officers to attend "Range Master" training, which proved to be a time-consuming process.  (Sanchez Decl., Ex. I.)  For nearly two years, the AR-15 rifles remained in the officer's possession while being registered to the CPD, during which time the CPD never provided any training on their use and never instituted policies and procedures to govern their use. (Christian Decl. ¶ 10; Hackett Decl. ¶¶ 8-9; Sanchez Decl. ¶ 12; Neujahr Decl. ¶ 8.)  Also during this time, the CPD owned "Ruger Mini-14" assault rifles. (Sanchez Decl. ¶ 12.)  The POA also requested to be trained in the use of the Mini-14 rifles, but at no relevant time did

1   the CPD "have a program sufficient to train officers in the use of assault weapons." (Sanchez

2   Decl. ¶ 12.)  On June 11, 2003, the POA sent a letter to Defendant City Manager Luis Estrada

3   asking him to "reconsider [his] position to agree with Chief Sanchez' decision to not allow [the

4   POA's selected officer] to train officers to use the [AR-15 or the Mini-14] rifles." (Christian

5   Decl., Ex. C.)  The POA complained that "[t]he CPD has an armory filled with vital policing

6   equipment that is brand new and is currently of no use to any of the officers because the CPD

7   cannot or is unwilling to get its officers trained." (Christian Decl., Ex. C.)

8       On August 22, 2003, a California DOJ employee wrote to Chief Sanchez concerning

9   the AR-15 rifles, stating: "If these officers fail to divest themselves of weapons they cannot

10  legally own, I will have to refer this matter to Firearms Division law enforcement section."

11  (Sanchez Decl .¶ 15, Ex. E.)  On August 29, 2003, City Manager Estrada "requested" that the

12  AR-15 rifles be turned over to the CPD within seven days.  (Estrada Decl. ¶ 8, Ex. A.)  City

13  Manager Estrada's deadline passed without any officer surrendering a rifle.  (Sanchez Decl.

14  ¶ 17.)  On September 15, 2003, Chief Sanchez issued a written order to each officer in

15  possession of an AR-15 rifle, requiring that the weapon be returned to the CPD by 5:00 p.m.

16  on September 24, 2003, or the officer would face disciplinary action up to and including

17  termination.  (Sanchez Decl. ¶ 18, Ex. G.)

18      On September 24, 2003, at approximately 11:00 a.m., a group of approximately 20 CPD

19  officers assembled in a public park directly across the street from the CPD station.  (Christian

20  Decl. ¶¶ 26, 29; Gonzalez Dep. at 84; Gerardo Decl. ¶ 3.)  The officers were in plain clothes,

21  most wearing black T-shirts bearing the letters "CLX POA."  (Gerardo Decl. ¶ 3.)  Many

22  officers carried signs, saying, among other things: "Chief Sanchez you are a liar and not a man

23  of your word," "Chief Sanchez your leadership is irresponsible," "Chief Sanchez's ego equals

24  ignorance," "Chief Sanchez you don't support us we don't support you," and "Give us the

25  tools to do our job!" (Hedrick Decl. ¶ 7, Ex. A.)  One sign depicted Chief Sanchez's name

26  with a circle and slash symbol over it.  (*Id.*)  Two protesters wore black ski masks.  (Duran

27  Decl. ¶ 80; Navarro Decl. ¶ 20.)  Many of the officers held AR-15s, with the barrels pointed

28  to the ground or "straight up, not at anyone and not waving around." (Duran Decl. ¶ 57;

Christian Decl. ¶ 32.)  There were numerous members of the media documenting the protest.  (Christian Decl. ¶¶ 33-34; Nestor Gonzalez Decl. ¶ 20.)  Some officers conducted interviews regarding the situation, criticizing Chief Sanchez and stating that this issue concerned officer safety and public safety.  (Hedrick Decl. ¶ 7, Ex. A.)  The officers did not yell or use profanity during the protest.  (Christian Decl. ¶ 31; Duran Decl. ¶ 55.)

At some point, approximately 13 of the officers holding rifles walked in single-file across the street to the public entrance of the CPD station.  (Cuellar Decl. ¶ 36; Hackett Decl. ¶ 24.)  The officers piled the rifles on the front counter of the station while they waited for someone in authority to collect the rifles on behalf of the CPD.  (Hackett Decl. ¶ 25; Garvin Decl. ¶ 4, Ex. B.)  One officer conducted a media interview in the lobby of the station.  (Garvin Decl. ¶ 4, Ex. B.)  After the officers waited nearly 45 minutes, a CPD Lieutenant led the officers to a break room in the station, where she inventoried the rifles and took possession of them on behalf of the CPD.  (Hackett Decl. ¶¶ 25, 28; Martinez Lara Decl. ¶ 11.)

Plaintiff Jesus E. Gonzalez, a CPD officer, was not on-duty on the day of the protest.  (Gonzalez Dep. at 84, 141.)  On the morning of the protest, Plaintiff attended a training seminar at City Hall, near the CPD station.  (Gonzalez Decl. ¶¶ 18-19.)  After the seminar, Plaintiff–who was not one of the officers who owned an AR-15 rifle–joined the protesting officers in the park across the street from the CPD station.  (Gonzalez Dep. at 95; Gonzalez Decl. ¶¶ 2, 21.)  Plaintiff wore a black POA T-shirt.  (Sanchez Decl. ¶ 26.)  According to Plaintiff, he did not hold a sign, wear a ski mask, or say anything during the protest.  (Gonzalez Decl. ¶ 24; Gonzalez Dep. at 89.)  Plaintiff testified: "I just stood there.  I was just there because I supported my association."  (Gonzalez Dep. at 95.)  Plaintiff later testified: "I was just there because I wanted to be trained and possess [the AR-15 rifle] while on duty. . . . I was just there to let them know I wanted some kind of training to defend myself where I needed to while on the streets."  (Gonzalez Dep. at 96.)  According to Plaintiff, the purpose of the protest was "to raise public awareness of the safety issue."  (Gonzalez Decl. ¶ 24.)  Plaintiff testified that during the protest, he handled the rifles while assisting another officer who "was checking the rifles to make sure they were not loaded for officer safety reasons."  (Gonzalez

Dep. at 134; *see also* Gonzalez Decl. ¶ 20 ("I noticed that Sgt. Duran was moving rifles from a vehicle and placing them in a box.  I began to assist Duran with the rifles, helping to check the chambers of the rifles the officers were bringing into the park.").)  Plaintiff did not go into the CPD station on the day of the protest.  (Gonzalez Decl. ¶ 26; Gonzalez Dep. at 90.)

Plaintiff had been with the CPD just under a year, and as such was still under the CPD's standard one-year probationary period for new officers.  (Sanchez Dep. II at 88.)   On September 25, 2003, the day after the protest, Defendant Lt. James Neujahr of the CPD gave Plaintiff a letter stating that his probation term had been extended to February 27, 2004. (Gonzalez Decl. ¶ 31.)  On September 30, 2004, Chief Sanchez fired Plaintiff.  (Gonzalez Decl. ¶ 32; Sanchez Dep. II at 17.)  No other officer who participated in the protest was fired, although six were reprimanded and one probationary sergeant was demoted.  (Sanchez Decl. ¶ 31; Duran Decl. ¶ 77; Gonzalez Decl. ¶ 22.)

Chief Sanchez testified that Plaintiff "didn't meet the police department's standards," because he engaged in conduct unbecoming an officer.  (Sanchez Dep. I at 59.)  When asked about what conduct was unbecoming, Chief Sanchez answered: "His actions of . . . carrying a weapon into a police department and causing our own city employees being fearful of our police officers."  (Sanchez Dep. I at 59-60.)  Chief Sanchez then engaged in the following colloquy with Plaintiffs' counsel:

> Q:   Did you order [Plaintiff] to return his weapon?
> A:   I ordered the owners of the weapons to turn in their weapons.
> Q:   Including Officer Gonzalez, correct?
>      . . . .
> A:   I have no idea if he was the owner of a weapon or not.
> Q:   Assuming he was an owner of one of the weapons . . . was it just the act of him walking in the department with the weapon to turn it in that was unbecoming?
> A:   I think it's unbecoming when you bring to the police department any kind of–I would say–I'm not saying disturbance.  I'm thinking about more like hostile, intimidation-type environment to the employees, being a police officer.
> Q:   I understand.  But what about [Plaintiff]'s conduct was hostile?
> A:   Carrying an assault rifle.

(Sanchez Dep. I at 60-61.)  Chief Sanchez also testified that prior to the day of the protest, he had "concerns" about whether Plaintiff was an "unbecoming officer for the department." (Sanchez Dep. II at 18.)  Specifically, "[t]here were some issues with some reports not being

turned in on time," as well as "improper use of equipment." (Sanchez Dep II at 18.) Chief

Sanchez "factor[ed] in" these prior issues when he came to the decision to terminate Plaintiff.

(Sanchez Dep. II at 18-19, 50-51, 87.) Chief Sanchez also testified that "having and being

properly trained with the AR-15 [can] enhance public safety." (Sanchez Dep. I at 69.)

In his Declaration, Chief Sanchez stated as follows:

20. Upon my return to the [CPD] Station th[e] day [of the protest], my assistant Martha Gomez told me about the protest and how it occurred. She told me some of the officers came into the station lobby with the weapons and accompanied by the news media. She told me the officers had demanded to see me and demanded entrance to the station. I asked Ms. Gomez to prepare a memorandum regarding the protest. . . .

21. According to the memorandum, many of the officers participating in this demonstration were openly carrying the illegal short-barreled AR-15 assault weapons which they had been ordered to turn in by the close of business that day. It also stated many of the officers were wearing black T-shirts with the letters "CLX POA" written on them, but little else to inform the public the demonstrators were Calexico police officers. Furthermore, two of the officers participating in the demonstration were wearing ski masks.

22. At my request, Ms. Gomez also prepared a list of the officers who participated in the protest. Officer Jesus Gonzalez' name was on that list. Officer Gonzalez was a probationary officer in the department. I spoke with other employees regarding the protest who corroborated Ms. Gomez' account. I also saw news media coverage of the protest.

23. On September 24, 2003, I prepared a report of my position on the assault rifle situation for the City Council. . . .

24. . . . [T]he Memorandum of Understanding [between the City and the POA] allows me to extend the probation of an officer for any reason for a period of up to a year.

25. The day after the demonstration, I directed Lt. James Neujahr to issue a letter extending [Plaintiff]'s probation for a period of six months while I further examined the officers' conduct during the demonstration.

26. In the days following the demonstration, I saw published newspaper articles describing the incident and showing photographs of the officers participating in the protest, including photographs showing Officer Gonzalez among the demonstrators wearing a black T-shirt and carrying an AR-15 rifle.

27. After considering and analyzing the events described above, I concluded the officers' conduct in carrying out the demonstration was disruptive to the operations of the [CPD], extremely discourteous to the public and the civilian employees at the police department, was potentially emotionally distressing to the employees of the [CPD] and unknowing members of the public who may have passed the demonstration and did, I am informed and believe, in fact frighten at least one civilian employee, and was otherwise unbecoming conduct on the part of a [CPD] officer.

28. I concluded the conduct of the protesters was conduct unbecoming to an officer in that the conduct reflected unfavorably upon the department, the City of Calexico and the employees themselves and held the department and City in disrepute.

29. Article 6, Section 2 and Article 15 of the Memorandum of Understanding [between the City and the POA] allows me to terminate a probationary employee without stating any reason.

30. In light of the manner of Officer Gonzalez' participation in the protest,

1
2
3

particularly in openly wielding an illegal AR-15 for which he was neither granted permission to possess nor was licensed to possess, and in light of the above-described information, I terminated Gonzalez' employment with the [CPD] during his extended probationary period.

(Sanchez Decl. ¶¶ 20-30.)

4
5
6
7
8
9

After Chief Sanchez terminated Plaintiff, City Manager Estrada "approved the termination and noted [his] approval by signing the City of Calexico's payroll documentation of the termination on October 2, 2003." (Estrada Decl. ¶ 16, Ex. B; *see also* Sanchez Dep. II at 87-88.) During his deposition, City Manager Estrada was asked: "Was the central reason involved in the termination of [Plaintiff] that he had a weapon . . . illegally?" He answered, "No." (Estrada Dep. at 46.)

10
11
12
13
14
15
16
17
18
19
20

Chief Sanchez never spoke with Plaintiff about the protest or his role in it. (Gonzalez Dep. at 95.) The day after the protest, Chief Sanchez ordered an investigation of "the whole incident." (Sanchez Dep. II at 61.) The POA would not cooperate with the investigator chosen by Chief Sanchez, so on February 11, 2004 (over four months after the protest), Chief Sanchez asked the Imperial Valley Sheriff's Office to conduct the investigation. (Sanchez Dep. II at 61-62, 95-96; Holguin Decl. ¶¶ 3-5.) On May 14, 2004, the Sheriff's Office investigator issued his report finding "there was insufficient evidence to clearly prove or disprove any allegations of wrong-doing on the part of the officers." (Holguin Decl. ¶ 80.) The investigator's 13-page report does not specifically reference Plaintiff. (Request Jud. Notice Supp. Summ. J., Ex. 4.)

21
22
23
24
25
26
27

On October 9, 2003, Plaintiffs POA and Gonzalez filed their original Complaint. (Doc. # 1.) After multiple motions to dismiss and subsequent amendments to the Complaint, Plaintiffs filed their Fourth Amended Complaint on May 26, 2005. (Doc. # 87.) After the Court granted Defendants' motion to dismiss on February 9, 2006 (Doc. # 108), only claim remaining in this lawsuit is the sixth cause of action for violation of First Amendment free speech and associational rights, prosecuted solely by Plaintiff Gonzalez pursuant to 42 U.S.C. § 1983.

28

On October 31, 2006, Defendants filed the Motion for Summary Judgment (Doc. # 127), arguing that, as a matter of law: Plaintiff's participation in, and conduct during, the

September 24, 2003 protest was not a matter of public concern; Plaintiff's speech was not a substantial or motivating factor for his termination; the CPD's legitimate administrative interests outweighed Plaintiff's First Amendment rights; none of the individual Defendants' actions violated clearly established law, and Defendants are entitled to qualified immunity; Defendants Nehjahr, Renison and Perrone did not personally participate in the decision to extend Plaintiff's probation or terminate his employment; and there is no municipal liability pursuant to *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). After the parties conducted supplemental discovery, the Court heard oral argument on March 5, 2007.

## II.   Discussion

### A.   Summary Judgment Standard of Review

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). An issue of fact is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. If the party moving for summary judgment does not have the ultimate burden of persuasion at trial, that party must produce evidence which either negates an essential element of the non-moving party's claims or that party must show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Once the moving

party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own evidence, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

### B.    First Amendment Standards

The Supreme Court "has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, -- U.S. ---, 126 S. Ct. 1951, 1957 (2006). Nevertheless, the Supreme Court has recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Garcetti*, 126 S. Ct. at 1957 ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services.") (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983) ("[G]overnment offices could not function if every employment decision became a constitutional matter.")).

The parties agree that Plaintiff's claim is a hybrid of both freedom of speech and freedom of association, which is subject to the freedom of speech *Connick/Pickering* analysis.[1] *See Hudson v. Craven*, 403 F.3d 691, 698 (9th Cir. 2005) ("The speech and associational rights at issue here are so intertwined that we see no reason to distinguish this hybrid circumstance from a case involving only speech rights."). "To prevail on a claim that a government employer punished a public employee for exercising her free speech rights, the employee must first show that her speech was constitutionally protected–that it addressed a matter of public concern. Second, the employee must show that the speech in question was a 'substantial or

---

[1] *See* Mem. Supp. Mot. Summ. J., Doc. # 127, at 19; Am. Mem. Opp'n Mot. Summ. J., Doc. # 183, at 10.

motivating factor' for the adverse employment action.  Even if the employee meets the burden of demonstrating that the relevant speech was a matter of public concern, such speech can be subject to government restriction.  Thus, if the employee meets her initial burdens, the burden shifts to the public employer to show that its 'legitimate administrative interests' outweigh the employee's interest in freedom of speech."  *Pool v. VanRheen*, 297 F.3d 899, 905-06 (9th Cir. 2002) (citations omitted); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) ("The problem in any case [alleging First Amendment infringement] is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

### C.    Matter of Public Concern

Defendants do not argue that Plaintiff's conduct does not constitute "speech" or "expressive conduct."[2]  Instead, Defendants argue that Plaintiff's participation in, and conduct during, the September 24, 2003 protest was not a matter of public concern.  Specifically, Defendants argue that in this case, "[t]he speech at issue primarily concerned internal department policy regarding choice of equipment and not a matter of public concern."  (Mem. Supp. Mot. Summ. J., Doc. # 127, at 8.)

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'"  *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick*, 461 U.S. at 146).  "Whether a public employee's speech or expressive conduct involves a matter of public concern depends

---

[2]  "To determine whether a public employee's supervisor violated an employee's First Amendment right to free speech, we must first determine whether speech was involved at all." *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999).  "[W]e 'have long recognized that [First Amendment] protection does not end at the spoken or written word.'  Non-verbal conduct implicates the First Amendment when it is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).  This is a factual determination. *See Thomas v. City of Beaverton*, 379 F.3d 802, 810 (9th Cir. 2004).

Here, there is at least a genuine issue of material fact as to whether Plaintiff's presence at the protest in a POA shirt was intended to convey the message of support for the POA and disagreement with Chief Sanchez's decision regarding the AR-15 rifles, and whether the likelihood is great that the message would be so understood.

upon 'the content, form, and context of a given statement, as revealed by the whole record.'" *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1200 (9th Cir. 2000) (quoting *Connick*, 461 U.S. at 147-48).[3] "[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84 (2004).  The Ninth Circuit has "defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace." *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) (emphasis in original) (citations omitted).

The content of the speech/expressive conduct (hereinafter, "speech") at issue supports the conclusion that the speech involved matters of public concern.  One aspect of the speech involved Plaintiff's and the POA's desire to be equipped with weapons that certain POA members felt were necessary for officer and public safety.  For example, one of the protester's signs read, "Give us the tools to do our job!"  (Hedrick Decl. ¶ 7, Ex. A.)  Another read, "The City Council turns a blind eye to officer safety."[4]  (*Id.*)  During an interview, one of the protesting officers stated that "Someone with a deer rifle can hold this city at bay."  (*Id.*)  According to Plaintiff, the purpose of the protest was "to raise public awareness of the safety issue."[5]  (Gonzalez Decl. ¶ 24; *see also* Duran Decl. ¶ 58 ("We protested to make the public aware of the Chief and City Officials' poor decision and that the City and Department was not taking appropriate measures to protect the public but instead was crippling the police department."); Christian Decl. ¶ 30 ("Signs protesters carried challenged the Chief's and City Officials' decision-making abilities and the wisdom of their decision not to allow the assault rifles for use in defending the public against criminals who carried AK-47's and other assault-

---

[3] "The determination whether speech involves a matter of public concern is a question of law." *Nunez v. Davis*, 169 F.3d 1222, 1227 n.1 (9th Cir. 1999) (citing *Connick*, 461 U.S. 138, 148 n.7).

[4] Prior to the protest, members of the POA had raised the issue of the AR-15 rifles at City Council meetings.  (Duran Decl. ¶ 59; N. Gonzalez. Decl. ¶¶ 35-36.)  The officers "told the Council why these guns were important to our work and to public safety."  (N. Gonzalez. Decl. ¶ 37.)

[5] "Looking to the speaker's motivation has been suggested as helpful in determining public concern." *Pool v. VanRheen*, 297 F.3d 899, 908 (9th Cir. 2002) (citation omitted).

1   type rifles.").)  Chief Sanchez testified that "having and being properly trained with the AR-15

2   [can] enhance public safety."  (Sanchez Dep. I at 69.)

3          Another aspect of the content of the speech involved criticism of the manner in which

4   Chief Sanchez ran the CPD.  *Cf. Pool v. VanRheen*, 297 F.3d 899, 906 (9th Cir. 2002)

5   (employee's speech involved a matter of public concern because, "[w]hile the Letter covers

6   a personnel dispute, it also critiques the Sheriff's Office policies and operations, as well as the

7   press coverage of these issues.").  During an interview, one of the protesting officers stated that

8   "All we want is to have our chief come down the hall, stick his head into the roll call room and

9   give us a reason why."  (Hedrick Decl. ¶ 7, Ex. A.)  One of the protester's signs read, "The

10  reason for this is why?"  (*Id.*)

11         Even if the content of the protest could be characterized as purely a "personnel matter,"

12  "the type of personnel matters that we have deemed unprotected under the public concern test

13  are employment grievances in which the employee is complaining about her own job

14  treatment, not personnel matters pertaining to others."  *Thomas v. City of Beaverton*, 379 F.3d

15  802, 808 (9th Cir. 2004) (citing *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 978

16  (9th Cir. 2002) (holding that a doctor's protest against the laying off of other physicians was

17  of public concern); *Hyland v. Wonder*, 972 F.2d 1129, 1138 (9th Cir. 1992) (concluding that

18  an employee's memorandum recommending termination of the Director of Juvenile Hall was

19  not an unprotected internal personnel dispute because the employee's memorandum "did not

20  concern [the employee's] dissatisfaction with his own position or on-the-job treatment").  In

21  this case, Plaintiff Gonzalez did not own an AR-15 rifle, and although he clearly wished to be

22  trained to use one in the future, the protest was focused the lack of training provided to the

23  owners of the AR-15 rifles, and the decision to require the owners to relinquish possession of

24  the weapons.

25         While the behavior of some of the POA protesters (such as wearing ski masks, carrying

26  weapons, and some of the messages on the signs) might be characterized as inappropriate or

27  controversial, "a statement's inappropriate or controversial nature is irrelevant to the question

28  of whether it deals with a matter of public concern."  *Pool v. VanRheen*, 297 F.3d 899, 906

(9th Cir. 2002) (statement that a sheriff's office was "very much like a septic tank, the really big chunks always rise to the top," involved a matter of public concern) (citing *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) ("Debate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.")).

The form and context of the speech also support the conclusion that Plaintiff's speech involved a matter of public concern. The portion of the protest in which Plaintiff participated occurred in a public park, involved the use of signs directed toward a public street, and was covered by the media. "While media publicity of a dispute is not determinative of whether a public employee's speech was a matter of public concern, it is a consideration." *Pool v. VanRheen*, 297 F.3d 899, 907 n.5 (9th Cir. 2002) (quotation omitted). The AR-15 rifle issue had been discussed at a City Council meeting prior to the protest, and "[c]itizens . . . spoke out at the Council meeting in support of [the POA members]." (N. Gonzalez. Decl. ¶ 38.)

Finally, the fact that Plaintiff did not speak or hold a sign during the protest, but (other than handling the rifles while assisting another officer in ensuring they were not loaded) merely stood silently with his fellow POA members (who were speaking and holding signs and rifles) does not alter the protected nature of his speech/associational activity. *See Hatcher v. Bd. of Pub. Educ. and Orphanage for Bibb County*, 809 F.2d 1546, 1557 & n.21 (11th Cir. 1987) ("Appellant sat in the parking lot on the hood of her car while the demonstrating parents carried signs, marched and sang. . . . The local media gave extensive coverage to the protest; including a sign declaring 'Close Hagler's Office–Leave Duresville Open!!!' . . . . Appellant's associational activity is no less protected because appellant chose to add the support of her silent presence to the efforts of those who took a more active role.").

Based upon the record, the Court concludes that the content, form and context of the speech at issue involved a matter of public concern.

**D.     Substantial or Motivating Factor**

Defendants argue that Plaintiff has failed to show that the speech in question was a "substantial or motivating factor" for the termination of his employment. Defendants contend

that Plaintiff was fired "because of his . . . *conduct* during the demonstration, not because of the *content* of his speech." (Mem. Supp. Mot. Summ. J., Doc. # 127, at 14 (emphasis in original).) Defendants emphasize that during the protest, Plaintiff "carried an AR-15 rifle which he did not own and which he was not licensed to carry." (*Id.* at 13.)

"The employee must show that the speech in question was a 'substantial or motivating factor' in the adverse employment action." *Pool v. VanRheen*, 297 F.3d 899, 908 (9th Cir. 2002) (citations omitted). The speech need only be one "of many contributing factors." *Id.* The determination of whether the speech is a 'substantial or motivating factor' in the adverse employment action is a factual one. *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 929 (9th Cir. 2004). In order to create an issue of fact on this issue, a plaintiff may show that "the defendants were aware of [plaintiff]'s expressive conduct," and "(i) establish proximity in time between [plaintiff]'s expressive conduct and the allegedly retaliatory actions; (ii) produce evidence that the defendants expressed opposition to his speech, either to him or to others; or (iii) demonstrate that the defendants' proffered explanations for their adverse actions were false and pretextual." *Id.* (citations omitted).

In this case, Defendants concede that they were aware of Plaintiff's participation in the protest. (Sanchez Decl. ¶¶ 22, 26; Estrada Decl. ¶ 13.) Plaintiff's employment was terminated six days after the protest. (Sanchez Decl., Ex. J.) Defendants' awareness of Plaintiff's participation and the proximity in time of Plaintiff's termination are alone sufficient to create a genuine issue of fact as to whether Plaintiff's participation in the protest was a substantial or motivating factor in the decision to terminate his employment. *See Alpha Energy Savers, Inc.*, 381 F.3d at 929.

Defendants argue that, as a matter of law, Plaintiff's speech was not a substantial or motivating factor in the decision to terminate his employment because he was not fired "because of the *content* of his speech," but "because of his *conduct* during the demonstration," namely, "carr[ying] an AR-15 rifle which he did not own and which he was not licensed to

carry."[6]  (Mem. Supp. Mot. Summ. J., Doc. # 127, at 13-14 (emphasis in original).)  However, Defendants point to no caselaw supporting this distinction.  Moreover, there is an issue of fact as to whether Defendants' proffered explanation of terminating Plaintiff solely for "carr[ying] an AR-15 rifle which he did not own and which he was not licensed to carry," is false and pretextual.  During his deposition, City Manager Estrada was asked: "Was the central reason involved in the termination of [Plaintiff] that he had a weapon . . . illegally?"  He answered, "No."  (Estrada Dep. at 46.)  Meanwhile, Chief Sanchez testified that he "ha[d] no idea if [Plaintiff] was the owner of a weapon or not."  (Sanchez Dep. I at 60-61.)  Based upon the evidence presented, a reasonable fact-finder could conclude that Plaintiff was fired not because he handled the weapons, but because he was the only probationary employee who participated in the POA protest.

The Court finds that there is an issue of fact as to whether Plaintiff's speech was a "substantial or motivating factor" for the termination of his employment.

**E.    *Pickering* Balance**

The next issue is known as the "*Pickering* balancing analysis," i.e., "whether the [CPD]'s interests as an employer outweigh [Plaintiff]'s First Amendment rights."  *Bauer v. Sampson*, 261 F.3d 775, 785 (9th Cir. 2001); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  "In balancing the competing interests, [the Ninth Circuit] has considered a host of factors.  We have inquired whether the speech (1) impaired discipline or control by superiors; (2) disrupted co-worker relations; (3) eroded a close working relationship premised on personal loyalty and confidentiality; (4) interfered with the speaker's performance of his or her duties; or (5) obstructed routine office operations.  Public employers need not allege that an employee's expression actually disrupted the workplace; reasonable predictions of disruption are sufficient.  Moreover, this court has weighed (6) whether the speaker directed the statement to the public or the media, as opposed to a governmental colleague; (7) whether the speaker served in a high-level, policy-making capacity; and (8) whether the statement was

---

[6] It is implicit in Chief Sanchez's order to return the rifles that the owners of the AR-15 rifles carry the rifles into the police station.  It is not implicit in the order that anyone other than the rifle owners handle the weapons prior to entering the station.

false or made with reckless disregard of the truth.  Because the *Pickering* balance necessarily involves a fact-sensitive inquiry involving the totality of the circumstances, no single factor is dispositive."  *Gilbrook v. City of Westminster*, 177 F.3d 839, 867-868 (9th Cir. 1999) (quotations and citations omitted).  "The employer bears the burden of proving that the balance of interests weighs in its favor."  *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 426 (9th Cir. 1995) (citation omitted); *see also Pool v. VanRheen*, 297 F.3d 899, 906 (9th Cir. 2002) (same).  "This issue is one of law and a determination is to be made by the court."  *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1200 (9th Cir. 2000) (citing *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983) ("The inquiry into the protected status of speech is one of law, not fact.")).  However, any material factual disputes relevant to the *Pickering* analysis are appropriately resolved at trial.  *See Gillette v. Delmore*, 886 F.2d 1194, 1198 (9th Cir. 1989) ("[T]here are questions of material fact in this case that cannot be resolved upon summary judgment.  The City argues that Gillette's statements interfered with the mission of the fire department, and made a difficult situation even more difficult and more dangerous for both the witnesses and fellow officers.  Gillette's affidavits, however, indicate that Gillette's statements did not agitate Dunsmoor or the witnesses, but helped calm them down.  These factual questions are appropriately resolved at trial.").

Prior to addressing the factors of the *Pickering* balancing analysis, there are two matters that are *not* relevant to the *Pickering* analysis.  First, in deciding that among all of the protesters, only Plaintiff would be discharged, Defendants were influenced by the fact that among all of the protesters, only Plaintiff was on probation.  (Sanchez Decl. ¶¶ 22, 29-30; Estrada Decl. ¶ 18 ("In light of [Plaintiff]'s conduct during the protest, and particularly in light of his status as a probationary employee, I approved the termination of [Plaintiff]'s employment with the [CPD].").)  However, "[w]here fundamental rights have allegedly been violated, a plaintiff's probationary status is completely irrelevant."  *McKinley v. City of Eloy*, 705 F.2d 1110, 1116 (9th Cir. 1983) ("Rather than raising a procedural due process claim that would entitle him to a hearing, plaintiff argues that his firing was the direct result of the exercise of protected first amendment rights of free speech and association.  Where

fundamental rights have allegedly been violated, a plaintiff's probationary status is completely irrelevant. . . .  A person discharged for engaging in constitutionally protected activity is entitled to reinstatement.  This is true whether the person is a probationary employee or a regular employee.") (citing *Perry v. Sindermann*, 408 U.S. 593, 597-98 (1972) ("[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons . . . [it] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests–especially, his interest in freedom of speech.")); *see also Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987) ("Even though [plaintiff] was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression.").  Therefore, the fact that Plaintiff was on probationary status is irrelevant to the *Pickering* analysis.

Also, one of the two decisionmakers, Chief Sanchez, based his decision to terminate Plaintiff's employment in part on the behavior of the protesters in the police station.[7]  (Sanchez Dep. I at 59-60.)  Chief Sanchez believed that Plaintiff was one of the protesters who carried a gun into the police station and remained in the public lobby for an extended time, allegedly causing a disruption in the station.[8]  (Sanchez Dep. I at 59-60; Sanchez Decl. ¶¶ 20, 22.)  However, there is at least an issue of fact as to whether Plaintiff entered the station on the day

---

[7]  The other decisionmaker, City Manager Estrada, did not express the opinion that Plaintiff entered the station during the protest.  (*See generally* Estrada Decl.)  During his deposition, City Manager Estrada engaged in the following colloquy:

Q:      [During the protest,] [d]id Mr. Gonzalez do anything other than walk down the street?
A:      I know he was there.
Q:      Okay.  Do you know anything he did?
A:      I don't know if he did.

(Estrada Dep. at 47.)  He also testified that he never attempted to "distinguish [Plaintiff's] conduct from the conduct of any of the other officers."  (Estrada Dep. at 46.)

[8]  The evidence is disputed as to whether, and to what extent, the protesters in the station actually caused a disruption.  (*Compare* Gomez Decl. ¶¶ 6-12 *with* Duran Decl. ¶¶ 64, 66-67; Christian Decl. ¶ 36; Hackett Decl. ¶¶ 24-28.)

of the protest.[9]  (Gonzalez Decl. ¶ 26; Gonzalez Dep. at 90.)  Viewing the facts in the light most favorable to Plaintiff, the Court assumes Plaintiff did not enter the station.  Therefore, the Court is faced with the issue of how much weight, if any, to attach to the events which occurred in the station on the day of the protest.  Defendants point to no case or other authority indicating that, in conducting the *Pickering* analysis of Plaintiff's claim, the Court may consider the actions taken by other protesters when Plaintiff was not present.  Accordingly, the Court gives little weight to the actions of the protesters inside the police station in conducting the *Pickering* analysis.

Many of the Ninth Circuit's *Pickering* factors weigh in favor of Plaintiff Gonzalez.  Plaintiff participated in the protest in a public park, directed at least in part toward the public and the media, rather than merely to another governmental colleague.  *See Gilbrook v. City of Westminster*, 177 F.3d 839, 868 (9th Cir. 1999) ("[Plaintiff] directed his statement, through the press, to the citizens of Westminster, not to another firefighter.  '[W]e have acknowledged that a narrow, limited focus and [a] limited audience weigh against [a] claim of protected speech.'") (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 981 (9th Cir. 1998)).  Furthermore, Plaintiff did not serve in a high-level, policy-making position.  As Defendants were aware, Plaintiff had not yet completed his initial probationary period as a police officer.  *See Gilbrook*, 177 F.3d at 868 ("[Plaintiff] did not occupy a high-level, policy-making position, for which personal loyalty and confidentiality are indispensable.  Were he in such a job, the City's interest in avoiding disruption would be enhanced.") (citing *Moran v. State of Wash.*, 147 F.3d 839, 850 (9th Cir. 1998) (making that observation with respect to employees who occupy a "confidential, policymaking, or public contact role") (citation and internal quotation marks omitted)); *cf. Pool v. VanRheen*, 297 F.3d 899, 906 (9th Cir. 2002) ("The government's interest in avoiding disruption is magnified when, as here, the employee asserting the right to free speech serves in a confidential, policymaking, or public contact role.  Further, the Letter was publicized while Pool was serving as Acting Sheriff, it was signed

---

[9]  Other than the testimony of Chief Sanchez, who was admittedly not present at any time during the protest, there is no evidence that Plaintiff entered the station on the day of the protest.

1   'Vera C. Pool, Commander, Multnomah County Sheriff's Office' and it listed the Sheriff's

2   Office address, thereby lending the authority of the Sheriff's Office to Pool's statements.")

3   (quotations omitted).  Also, Plaintiff was off-duty during the protest (Gonzalez Dep. at 84,

4   141), and Defendants have failed to show how Plaintiff's participation in the protest otherwise

5   "interfered with [his] performance of his . . . duties." *Gilbrook*, 177 F.3d at 868 (citing *Fazio*

6   *v. City & County of San Francisco*, 125 F.3d 1328, 1331 n.1 (9th Cir. 1997)).

7         Defendants emphasize that "the unit of government in which [Plaintiff] worked was a

8   police department, a quasi-military organization.  Discipline and esprit de corps are vital to its

9   functioning. . . .  '[A] wide degree of deference to the employer's judgment is appropriate'

10   when 'close working relationships are essential to fulfilling public responsibilities'. . . ."

11   *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201 (9th Cir. 2000) (quoting *Connick*, 461

12   U.S. at 151-52).  However, even granting Defendants a wide degree of deference, Defendants

13   have failed to show that Plaintiff's minimal role in the protest–wherein Plaintiff wore a POA

14   shirt and handled some of the rifles, but did not speak, hold a sign, wear a mask, or enter the

15   station–contributed in a significant way to the actual or threatened "impair[ing of] discipline

16   or control by superiors," "disrupt[ion of] co-worker relations," "ero[sion of] a close working

17   relationship premised on personal loyalty and confidentiality," or "obstruct[tion of] routine

18   office operations." *Gilbrook*, 177 F.3d at 868.  This is particularly true when Plaintiff's actions

19   are placed in the larger context of the long-running and highly-publicized dispute between the

20   POA and City officials concerning the AR-15 rifles.  *Cf. Gilbrook*, 177 F.3d at 869 ("[T]he

21   morale of firefighters already was badly damaged because of the budget cuts and the public

22   accusations of corruption.  In such circumstances, Garrison's statement could have had, at

23   most, a marginal impact on the firefighters' morale.").

24         Defendants also argue that Plaintiff's interest in expressing his First Amendment rights

25   in this context is relatively minor.  Defendants contend that the manner in which Plaintiff

26   expressed his First Amendment rights–by handling rifles that he did not own and did not have

27   a legal right to possess, while wearing little to identify him as a police officer to the

28   public–diminish his interest.  *Cf. Pool v. VanRheen*, 297 F.3d 899, 908 (9th Cir. 2002) ("The

speech in question should not be considered in a vacuum, but in conjunction with the manner, time and place of the employee's expression and the context in which the dispute arose.") (citation omitted). However, viewing the facts in the light most favorable to Plaintiff, even a diminished interest in expressing his First Amendment rights is sufficient to outweigh the Defendants' interests, given the degree to which the *Pickering* factors weigh in favor of Plaintiff, as discussed above. Moreover, there is an issue of fact as to whether Plaintiff's handling of a rifle he did not own constituted the actual motivation for his termination.[10] *Cf. Waters v. Churchill*, 511 U.S. 661, 681-82 (1994) (reversing grant of summary judgment and remanding because, although the government employer reasonably and in good faith believed that plaintiff made statements unprotected by the First Amendment, there was an issue of fact as to whether the government employer fired plaintiff because of the unprotected speech or because of some other speech). If Plaintiff were fired simply because of his participation in the protest, his interest in expressing his First Amendment rights would be greater, and would further tip the *Pickering* balance in his favor.

The Court finds that Defendants have failed to show that they are entitled to summary judgment on the ground that their legitimate administrative interests outweigh Plaintiff's First Amendment interest in freedom of speech and association.

## F.    Qualified Immunity

Defendants next argue that none of the individual Defendants' actions violated clearly established law, and thus they each are entitled to qualified immunity.

"Public officials are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known.'" *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The plaintiff shoulders the burden of proving that the rights he claims are 'clearly established.'" *Id.* (citing

---

[10]   As set out above, Chief Sanchez testified that he "ha[d] no idea if [Plaintiff] was the owner of a weapon or not." (Sanchez Dep. I at 60-61.) During his deposition, City Manager Estrada was asked: "Was the central reason involved in the termination of [Plaintiff] that he had a weapon ... illegally?" He answered, "No." (Estrada Dep. at 46.)

03cv2005

*Davis v. Scherer*, 468 U.S. 183, 197 (1984)). "Whether the right at issue in a claim of qualified immunity is clearly established is judged as of the date of the incident alleged and is a pure question of law. . . ." *Phillips v. Hust*, 477 F.3d 1070, 1079 (9th Cir. 2007) (citation omitted).

"[Q]ualified immunity provides a protection to government officers that is quite far-reaching. Indeed, it safeguards 'all but the plainly incompetent or those who knowingly violate the law. . . . [I]f officers of reasonable competence could disagree on th[e] issue [of whether a chosen course of action is constitutional], immunity should be recognized.'" *Brewster*, 149 F.3d at 977 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The Ninth Circuit "has observed that the *Pickering* test requires particularized balancing on the unique facts presented in each case, and the Supreme Court has specifically stated that the *Pickering* balance is a 'difficult' one to strike. Because, under *Pickering*, the determination whether an employee's expression is constitutionally protected requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will 'rarely, if ever, be sufficiently clearly established to preclude qualified immunity under *Harlow* and its progeny.'" *Id.* at 979-80 (quoting *Moran v. Washington*, 147 F.3d 839, 847 (9th Cir. 1998); other quotations and citations omitted)).

The issue is whether "it was 'clearly established' that the plaintiff's speech was deserving of constitutional protection when spoken. The first part of that inquiry involves asking whether the public employee's speech addresses a matter of public concern." *Gilbrook*, 177 F.3d at 866 (citing *Brewster*, 149 F.3d at 978). As discussed above, as to this question of law, the Court has found that Plaintiff's speech addressed a matter of public concern. However, officials of reasonable competence could disagree as to this issue. In light of the long-running conflict between the POA and City officials over the AR-15 rifles, a reasonable official could view the protest as concerning "internal power struggles within the workplace." *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996) ("This circuit and other courts have defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace.") (emphasis in original) (citations omitted). Although this Court ultimately finds the case to be

1   distinguishable because, *inter alia*, of the public and publicized nature of the AR-15 protest,[11]

2   the Court concludes that a reasonable official could feel that the POA's protest concerning the

3   use of AR-15 rifles is analogous to *Kuchenreuther v. City of Milwaukee*, 221 F.3d 967 (7th Cir.

4   2000), wherein the Seventh Circuit stated: "While speech addressing matters of police

5   protection and public safety are matters of public concern, . . . in questioning Chief Jones'

6   policy that police officers can carry only one set of handcuffs, [plaintiff] was merely

7   complaining about a change in equipment allocation.  Consequently, we are of the opinion that

8   [plaintiff] addressed only an 'inside' matter pertaining to her work condition, and therefore

9   [plaintiff]'s speech at the in-service meeting did not address a matter of public concern within

10  the meaning of *Connick*."  *Id.* at 974-75 (quotation and citations omitted).

11          While the Court has found that Defendants failed to show that they are entitled to

12  summary judgment on the ground that their legitimate administrative interests outweigh

13  Plaintiff's First Amendment interest in freedom of speech and association, the Court finds that

14  the balancing of competing interests is not sufficiently clearly established to preclude qualified

15  immunity.  *See Brewster*, 149 F.3d at 979-80 ("Because, under *Pickering*, the determination

16  whether an employee's expression is constitutionally protected requires a fact-sensitive,

17  context-specific balancing of competing interests, the law regarding public-employee free

18  speech claims will rarely, if ever, be sufficiently clearly established to preclude qualified

19  immunity under *Harlow* and its progeny.") (quotation omitted).  In particular, Plaintiff's

20  handling of the AR-15 rifles during the protest raises issues that has not been addressed by

21  prior cases.  The weight to be assigned in the *Pickering* balance to the fact that Plaintiff

22  handled rifles that he did not own and did not have a legal right to possess, while wearing little

23  to identify him as a police officer to the public, was not clearly established at the time of the

24  protest.  A reasonable employer could believe that Plaintiff's holding a rifle in a public park,

25  while wearing a black T-shirt with only the letters "CLX POA" written on it, could have the

26  _____

27          [11]  *Cf. Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 975 n.18 (7th Cir. 2000)
    ("The fact that [plaintiff] raised the issue of equipment allocation within the private confines
28  of the Milwaukee police training academy bolsters our conclusion that [plaintiff]'s real concern
    relates to her employment.").

1  effect of alarming members of the public, and be counter-productive to the mission of the
2  police department.  Given the "wide degree of deference to the employer's judgment" that is
3  accorded a police-department employer, *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201
4  (9th Cir. 2000), and "[i]n view of the competing considerations on each side of the *Pickering*
5  balance and the absence of specific direction from the relevant case law, it would . . . be
6  dubious indeed to conclude that [Plaintiff]'s right to speak was sufficiently 'clearly
7  established' to defeat the [employer's] assertion of qualified immunity."  *Brewster*, 149 F.3d
8  at 981.

9      The Court finds that Plaintiff has failed to demonstrate that it was clearly established
10 that the Plaintiff's speech was deserving of constitutional protection.  Therefore, the Court
11 finds that each of the individual Defendants are entitled to summary judgment on the ground
12 of qualified immunity.[12]

13      **G.    Municipal Liability**

14      The City argues that it is entitled to summary judgment on the ground that there is no
15 municipal liability pursuant to *Monell v. Department of Social Services of New York*, 436 U.S.
16 658 (1978).  "In *Monell* . . ., the Supreme Court held that the word 'person' in § 1983 includes
17 municipalities and other local governing bodies . . . .  A [municipality's or other local
18 governing body]'s liability under *Monell* may be premised on any of three theories: (1) that a
19 [government] employee was acting pursuant to an expressly adopted official policy; (2) that
20 a [government] employee was acting pursuant to a longstanding practice or custom; or (3) that
21 a [government] employee was acting as a 'final policymaker.'"  *Lytle v. Carl*, 382 F.3d 978,
22 982 (9th Cir. 2004) (citing *Webb v. Sloan*, 330 F.3d 1158, 1164 (9th Cir. 2003)).  Plaintiff
23 Gonzalez relies solely upon the third theory.  "Whether a particular official has 'final
24 policymaking authority' is a question of state law. . . ."  *Id.* (quotation omitted).

25

26      [12] Defendants Nehjahr, Renison and Perrone additionally argue that they are entitled
27 to summary judgment on the ground that they did not personally participate in the decision to
extend Plaintiff's probation or terminate his employment.  Because the Court has found that
28 each of the individual Defendants, including Nehjahr, Renison and Perrone, are entitled to
summary judgment on the ground of qualified immunity, the Court will not address Nehjahr,
Renison and Perrone's additional argument.

03cv2005

At all relevant times, City Manager Estrada was the administrative head of City government, with authority to remove any City employee except for the Clerk, City Attorney and City Treasurer.  (Estrada Decl. ¶ 2; Barker Decl., Ex. T, Calexico Municipal Code §§ 2.02.080, 2.02.100, 2.02.110.)   At all relevant times, Chief Sanchez was "authorized to suspend or remove from service any officer or policeman . . . subject to the approval of the City Manager."  (Barker Decl., Ex. T, Calexico Municipal Code § 2.10.060.)   Defendants concede that Chief Sanchez and City Manager Estrada are "both policymaking defendants."  (Mem. Supp. Mot. Summ. J., Doc. # 127, at 28.)  Chief Sanchez made the decision to extend Plaintiff's probation and to terminate Plaintiff's employment (Sanchez Decl. ¶¶ 25, 30), and City Manager Estrada "approved the termination and noted [his] approval by signing the City of Calexico's payroll documentation of the termination on October 2, 2003" (Estrada Decl. ¶ 16; *see also* Estrada Decl., Ex. B; Sanchez Dep. II at 87-88).

Chief Sanchez and City Manager Estrada are officials "whose edicts or acts may fairly be said to represent official policy."  *Monell*, 436 U.S. at 694; *see also McKinley v. City of Eloy*, 705 F.2d 1110, 1117 (9th Cir. 1983) (holding that the city was liable under *Monell* for the city manager's decision to fire a probationary police officer in violation of his First Amendment rights for publicly criticizing the city's decision not to give police officer's an annual raise).  The Court concludes that the firing of Plaintiff was an official act for which the City may be liable under section 1983.  "It does not matter that the final policymaker may have subjected only one person to only one unconstitutional action. . . .  A municipality can be liable for an isolated constitutional violation when the person causing the violation has final policymaking authority."  *Lytle*, 382 F.3d at 983 (quotation omitted).  Therefore, Defendants' Motion for Summary Judgment as to the City's liability pursuant to 42 U.S.C. § 1983 is **DENIED**.

### H.    Parties' Objections

Defendants' Objections to the Declaration of Elizabeth A. Barker, Exhibits A and B (Doc. # 188) are **SUSTAINED**.  The Court did not consider Exhibits A and B attached to the Declaration of Elizabeth A. Barker (Doc. # 184, filed under seal) in deciding the Motion for

Summary Judgment.

Defendants' Objection to Plaintiff's Notice of Errata and Late Filed Declaration (Doc. # 190) is **SUSTAINED**.  The Court did not consider Plaintiff's Notice of Errata and the Declaration of Richard H. Castle (Doc. # 189) in deciding the Motion for Summary Judgment.

All objections to evidentiary materials cited in this Order are **OVERRULED**.  All objections to evidentiary materials not cited in this Order are **DENIED** as moot.

## III.    Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment (Doc. # 127) is **GRANTED IN PART** and **DENIED IN PART** as follows: the Motion for Summary Judgment is **GRANTED** as to all individual Defendants on the basis of qualified immunity; the Motion for Summary Judgment is **DENIED** as to the City's liability pursuant to 42 U.S.C. § 1983.

The Motion for Late Filing of Exhibits Under Seal (Doc. #187) is **GRANTED**.  The Exhibits to the Declaration of Elizabeth A. Barker (Doc. # 184) shall be sealed pursuant to the Protective Order (Doc. # 143).

On **June 29, 2007 at 11:00 a.m.**, the Court will initiate a telephonic status conference to schedule the remaining pretrial dates and the trial date.

DATED:  June 14, 2007

**WILLIAM Q. HAYES**
United States District Judge